**AMENDED AND RESTATED**
**COMPANY AGREEMENT OF**
**JET OILFIELD SERVICES, LLC**

This Amended and Restated Company Agreement of JET OILFIELD SERVICES, LLC (this "Agreement") is entered into effective September 17th, 2019 by BRANDON WILKINS ("Wilkins"), LORNE MOSELEY ("Moseley"), THOMAS SMITH ("Smith") and BRIAN OWEN ("Owen") as the sole members, and JET OILFIELD SERVICES, LLC, a Texas limited liability company, as the company (the "Company").

In consideration of the mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members agree as follows:

WHEREAS, Wilkins, Mosely and Smith have previously formed the Company under the laws of the State of Texas, as set forth in that certain Company Agreement dated August 28, 2018 (the "Original Company Agreement");

WHEREAS, the Members desire to restate and amend the Original Company Agreement such that this Agreement will be executed in total replacement of and substitution for the Original Company Agreement.

**Article 1**
**FORMATION**

**1.1**    **Formation**.  The Certificate of Formation of Jet Oilfield Services, LLC, dated August 28, 2018 (the "Certificate"), was filed with the Secretary of State of Texas.  Upon the filing of the Certificate, the Company was established as a Texas limited liability company pursuant to the Texas Limited Liability Company Law of the Texas Business Organization Code (the "Code"), as amended to date and as may be amended from time to time hereafter and any successor to such Code.

**1.2**    **Office Address; Registered Office and Agent.**  The principal place of business and the principal office of the Company will be 8511 Ridgelea Street, Dallas, Texas  75209, or at such other place as is determined by the Managers (defined below).  The registered office of the Company shall be at 8511 Ridgelea, Dallas, Texas 75209, and the registered agent will be Brandon Wilkins.

**1.3**    **Characterization.**  For federal income tax purposes, the Company shall be characterized as an association taxable as a partnership if there is more than one member, otherwise it will be disregarded.  However, for state law purposes, the Company shall not be characterized as, or treated as, a partnership (or disregarded), nor shall any Member be characterized as, or treated as, a partner.  The Managers shall operate the Company in a manner consistent with such characterizations, and no Member shall take any act, or fail to take any act, which is not consistent with such characterizations.

-1-

<span style="color:red">**EXHIBIT 3**</span>

**1.4** **Company Name.** The business of the Company shall be conducted under the name "Jet Oilfield Services, LLC"

**1.5** **Purpose.** The principal purpose of the Company will be as set forth in the Certificate.

**1.6** **Term.** The term of the Company shall be perpetual unless earlier dissolved and liquidated as provided in this Agreement or the Certificate.

## ARTICLE 2
### Definitions

"Accepting Member" has the meaning set forth in Section 9.5(c).

"Additional Member" means any Member admitted to the Company as an additional Member pursuant to Section 3.4.

"Adjusted Capital Account Deficit" means a deficit balance in a Member's Capital Account after giving effect to any amounts the Member is obligated to contribute or restore to the Company pursuant to the penultimate sentences of Reg. Sections 1.704-2(g)(1) and 1.704-2(i)(5), and subsequently such Member's share of the items described in Reg. Section 1.704-2(b)(2)(ii)(d)(4), (5) and (6).

"Advancement of expenses" has the meaning set forth in Section 8.11(b).

"Affiliate" means, with respect to any Person that is: (a) a natural person, (i) each entity that such Person Controls, (ii) each member of such Person's Immediate Family (including any trust entirely for the benefit of a member of members of such Person's Immediate Family); and (b) an entity, (i) each entity that such Person Controls, (ii) each Person that Controls such Person, and (iii) each entity that is under common Control with such Person.

"Agreement" means this Company Agreement, as amended, modified or supplemented from time to time.

"Appraiser" has the meaning set forth in Section 9.1(c).

"Assignee" and "Assignees" has the meaning set forth in Section 9.2(a).

"Assignee Interest" has the meaning set forth in Section 9.2(a).

"Assigning Member" has the meaning set forth in Section 9.2(a).

"Available Cash" means the amount of cash that the Managers deems available for distribution to the Members, taking into account all debts, liabilities, and obligations of the Company then due and amounts that the Managers deems necessary to place into reserves for customary and usual claims with respect to the Company's business, including, but not limited

**EXHIBIT 3**

to, reserves for (a) the repayment of any debts or liabilities of the Company (including any debts owed to the Members), (b) working capital requirements of the Company, and (c) any contingent or unforeseen liabilities of the Company.

"Capital Account" means, with respect to each Member, the account established and maintained for the Member on the books of the Company in compliance with Reg. §§1.704-1(b)(2)(iv) and 1.704-2, as amended.  Subject to the preceding sentence, each Member's Capital Account shall initially equal the amount of cash and the Gross Asset Value of any other property initially contributed by such Member to the Company.  Throughout the term of the Company, each Member's Capital Account will be (i) increased by the amount of (a) Profits (or items thereof) allocated to such Member pursuant to Sections 4.1 and 4.2, (b) such Member's Capital Contribution, and (c) such Member's Member Loans, and (ii) decreased by the amount of (a) Losses (or items thereof) allocated to such Member pursuant to Sections 4.1 and 4.2, (b) the amount of principal payments paid to such Member's Member Loans, and (c) the amount of distributions in cash and the fair market value (as determined by the Managers) of property (net of liabilities secured by the property that such Member is considered to assume or take subject to pursuant to the provisions of Code Sec. 752) distributed to such Member.

"Capital Contribution" means the amount of cash or the Gross Asset Value of property (other than cash) contributed or deemed to be contributed to the Company by a Member pursuant to Sections 3.1 and 3.2, reduced, in the case of a contribution of property other than cash, by the amount of liabilities of such Member that are assumed by the Company in connection with such Capital Contribution or are secured by any property (other than cash) contributed by such Member to the Company.

"Certificate" means the Certificate of Formation of the Company, as amended, modified or supplemented from time to time.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or any succeeding law).

"Confidential Information" has the meaning set forth in Section 13.1(b).

"Control" (including the terms "Controlled by" and "under common Control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Deadlock" means for any Major Decision, that the Members neither approve nor disapprove of the Major Decision at issue.

"Default Interest Rate" means a rate per annum equal to the lesser of (a) six percent (6%) plus the prime rate published by the Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

**EXHIBIT 3**

"Depreciation" means for any Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset of the Company, except if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of the Fiscal Year, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managers.

"Disability" means, with respect to a Person, the inability of such Person to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can reasonably be expected to result in death or that has lasted or can reasonably be expected to last for a continuous period of not less than 12 months.

"Disagreeing Party" has the meaning set forth in Section 9.1(c).

"Dispute" means a claim, demand, disagreement, controversy, or dispute (including, without limitation, a tied vote on business matters).

"Electing Member" has the meaning set forth in Section 3.2(a).

"Eligible Offering" has the meaning set forth in Section 9.5(a).

"First Appraisal" has the meaning set forth in Section 9.1(c).

"First Appraiser" has the meaning set forth in Section 9.1(c).

"First Section 9.2 Event Appraisal" has the meaning set forth in Section 9.2(c).

"First Section 9.2 Event Appraiser" has the meaning set forth in Section 9.2(c).

"Fiscal Year" means the calendar year; provided, however, that the first Fiscal Year of the Company shall begin on the date the Certificate is filed with the Secretary of State and end on December 31 of that same year and the last Fiscal Year of the Company shall end on the date on which the Company is terminated.

"Fundamental Business Transaction" has the meaning assigned to it by the definitions in the TBOC, as may be amended from time to time, and includes (a) a merger, (b) an interest exchange, (c) a conversion, or (d) a sale of all or substantially all of an entity's assets (with or without goodwill).

"Gross Asset Value" means with respect to an asset of the Company, such asset's adjusted basis for federal income tax purposes, except as follows: (1) the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value

-4-
# EXHIBIT 3

of such asset, as unanimously agreed to by the Members; (2) the Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution or in exchange for services; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company assets as consideration for an interest in the Company; and (iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clause (i) and clause (ii) of this sentence shall be made only if the Managers reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; (3) the Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as unanimously agreed to by the Members; (4) the Gross Asset Values of Company assets shall be adjusted to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); and (5) if the Gross Asset Value of an asset has been determined or adjusted pursuant to clause (1) or (2) above, such Gross Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Immediate Family" means, with respect to a Member, any Person who is an ascendant or descendant of a Member, or a descendant of a parent of a Member, or their respective spouses. For these purposes, a descendant includes persons who are adopted, provided such adoptions are made prior to a person's attainment of 21 years of age.

"Indemnified Party" has the meaning set forth in Section 8.11(a).

"Interest", when used in reference to an interest in the Company, means the entire ownership interest of a Member in the Company at any particular time.

"Liquidator" has the meaning set forth in Section 10.2(b).

"Major Decision" means any decision to act or not to act on behalf of the Company that relates to the following:

(i)     selling, assigning, transferring, exchanging, granting leases in or otherwise disposing of the Company's assets, any material portion thereof or any material interest therein, except for dispositions of obsolete or surplus equipment in the ordinary course of the Company's business;

(ii)    incurring any debt on behalf of the Company (except for trade debt incurred in the ordinary course of the Company's business and due within twelve (12) months or debt permitted under the Company's budget);

(iii)   except as set forth in a budget previously approved by the Members, making any single expenditure in excess of $25,000.00.

# EXHIBIT 3

(iv)    changing or permitting to be changed in any substantial way the accounting process and procedures employed in keeping the books of account or preparing financial statements or income tax returns with respect to the operation or management of the Company or its properties pursuant to this Agreement;

(v)     settling any tort or insurance claim in excess of $25,000.00;

(vi)    settling any claim in excess of $25,000.00 for payment to awards or damages arising out of the exercise of expropriation or condemnation by any public or governmental authority;

(vii)   making, executing or delivering on behalf of the Company any assignment for the benefit of creditors or any guarantee, indemnity bond, or surety bond, or any equivalent thereof;

(viii)  obligating the Company as a surety, guarantor or accommodation party to any obligation;

(ix)    lending funds belonging to the Company to any third party or extending to any person, firm or other entity, credit on behalf of the Company;

(x)     taking any action which requires approval of the Members under any provision of this Agreement or the Articles;

(xi)    making distributions to Members; or

(xii)   the appointment or removal of a Manager.

"Majority Interest" means the Members holding among them, in the aggregate, more than fifty percent (50%) of the Percentage Interests of all Members.

"Managers" means each Person named as Managers in this Agreement and each Person designated as an additional Managers or successor Managers pursuant to the terms of this Agreement.

"Member" means each Person named as a member in the forepart to this Agreement and each Person admitted as a Substituted Member or an Additional Member pursuant to the terms of this Agreement, and, with respect to those provisions of this Agreement concerning a Member's rights to receive a share of profits or other distributions or the return of a Member's contribution, any Transferee of a Member's Interest in the Company (except that a Transferee who is not admitted as a Member shall have only those rights specified by the TLLCL and which are consistent with the terms of this Agreement).

"Members" means each member providing the Capital Contribution and owning such Membership Percentage as set forth on Exhibit A.

**EXHIBIT 3**

"Notice Period" has the meaning set forth in Section 9.5(b).

"Participating Interests" means Interests of the Company, however designated, that participate on a pro rata basis with the Interests as to the amount of distributions upon liquidation or dissolution of the Company.

"Partnership Representative" has the meaning set forth in Section 6.3(a).

"Percentage Interest" means the Percentage Ownership set forth opposite such Member's name in Exhibit A.

"Permitted Transfer" has the meaning set forth in Section 9.1(h).

"Person" means any individual, partnership, Limited Liability Company, corporation, trust or other entity.

"Proceeding" has the meaning set forth in Section 8.11(a).

"Profits and Losses" means for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

     (a)    any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

     (b)    any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

     (c)    in the event the Gross Asset Value of any Company asset is adjusted in accordance with the definition of "Gross Asset Value" above, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses (and shall be interpreted and applied in a manner consistent with Regulations Section 1.704-1(b));

     (d)    gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

# EXHIBIT 3

(e)     in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation for such Fiscal Year or other period, computed with respect to the Gross Asset Value of such property consistent with the above definition of Depreciation and the requirements of Treasury Regulation Section 1.704-1(b)(2)(iv)(g); and

(f)     Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Section 4.2 hereof shall not be taken into account in computing Profits or Losses.

"Property" means all real and personal property that has been contributed to or acquired by the Company.

"Reg." or "Regs." means regulations promulgated under the Code by the Department of the Treasury of the United States of America.

"Regular Interest Rate" means the per annum rate equal to the prime rate published from time to time in the Wall Street Journal or, if such newspaper is no longer published, the prime rate as published from time to time in a national financial newspaper or journal of similar stature.

"Regulatory Allocations" has the meaning set forth in Section 4.2(h).

"Restricted Period" has the meaning set forth in Section 11.2.

"Second Appraisal" has the meaning set forth in Section 9.1(c).

"Second Section 9.2 Event Appraisal" has the meaning set forth in Section 9.2(c).

"Section 9.2 Event" has the meaning set forth in Section 9.2(a).

"Section 9.2 Event Appraiser" has the meaning set forth in Section 9.2(c).

"Section 9.2 Event Disagreeing Party" has the meaning set forth in Section 9.2(c).

"Specified Value" means an Offeror's estimate, in his sole discretion, of the fair market value of all of the assets of the Company, as set forth in the notice given by the Offeror, pursuant to Section 11.2, less all of the Company's then existing obligations, without assigning any minority discount on account of the Offeror's or Offeree's ownership of less than a majority interest of the Company.

"Substituted Member" means any Person admitted to the Company as a substituted Member pursuant to Article 9.

"Super Majority of Members" means the Members holding among them, in the aggregate, more than eighty percent (80%) of the Percentage Interests of all Members.

-8-
# EXHIBIT 3

"Tax Distribution" has the meaning set forth in Section 5.3.

"TBOC" means the Texas Business Organizations Code and any successor statute, as amended.

"Third Appraisal" has the meaning set forth in Section 9.1(c).

"Third Appraiser" has the meaning set forth in Section 9.1(c).

"Third Section 9.2 Event Appraisal" has the meaning set forth in Section 9.2(c).

"Third Section 9.2 Event Appraiser" has the meaning set forth in Section 9.2(c).

"TLLCL" means the Texas Limited Liability Company Law, being the provisions of Title 3 and the provisions of Title 1 of the TBOC to the extent applicable to limited liability companies, as amended from time to time (or any corresponding provisions of succeeding law).

"Transfer" means to sell, assign, pledge or in any manner dispose of, or create, or suffer the creation of, a security interest in or any encumbrance on all or a portion of an Interest in the Company (any Person who effects a Transfer being referred to as a "Transferor" and any person to whom a Transfer is effected being referred to as a "Transferee").

"Withheld Amount" has the meaning set forth in Section 5.5.

### ARTICLE 3
### Capital Contributions

**3.1  Capital Contributions.**  Each Member has made the Capital Contributions described for that Member in Exhibit A of this Agreement and each Member hereby agrees that the amount set forth under the column headed Capital Contribution opposite each Member's name in Exhibit A hereto accurately reflects the amount of cash and/or the Gross Asset Value of any property other than cash contributed to the Company by such Member.  On or before March 16, 2020 Owen will make an additional capital contribution equal to the sum of Three Million Dollars ($3,000,000.00).

**3.2  Member Loans.**  The Managers, may from time to time, request that the Members loan cash to the Company.  The Members shall have no obligation to make loans.  The Managers may however request that the Members loan cash to the Company that is determined in Annual Budget as necessary for the Company to meet its obligations.  The Managers shall notify each of the Members of the need for Member Loans pursuant to this Section 3.2 when appropriate, which notice shall include a statement of the proposed uses of the Member Loans and a date (which date may be no earlier than the seventh business day following such Member's receipt of his or its notice) before which the loan advance is requested.  Any Member Loans shall be on the following terms:  The amount lent shall bear interest at the rate 6.0%, commencing

**EXHIBIT 3**

from the date that the advance is made until the date that the loan, together with all interest accrued thereon, is repaid in full to the lending Member.

**3.3** **Return of Capital Contributions.**   A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.  An un-repaid Capital Contribution is not a liability of the Company or of any Member.  Subject to Section 3.2 and Section 3.3, a Member is not required to contribute to or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.  Notwithstanding the foregoing, a Member may make loans to the Company on such terms (including rate of interest) as shall be determined by the unanimous approval of the  Members.  All distributions will be first distributed to the Members making such loans until the loans are repaid in full, together with interest.  If distributions are insufficient to repay all loans as provided above, the funds available will first be applied to repay accrued interest on any such loan.  Any remaining funds will be applied to pay remaining loan balances, beginning with the oldest outstanding loans.  Loans with the same origination date will be repaid on a pro rata basis in the proportion that the loan bears to the total loans made on that date.

**3.4** **Admission of Additional Members.**  Additional Persons may be admitted to the Company as Members and Interests may be created and issued to those Persons and to existing Members upon the unanimous consent of the Members, on such terms and conditions as the Members may determine at the time of admission.  The terms of admission or issuance must specify the Percentage Interests applicable thereto.  Upon admission of an Additional Member, the Percentage Interest of each Member shall be adjusted in accordance with Section 4.5.  Any such admission also must be accompanied by a representation by such Person and, at the request of the Managers, an opinion of counsel satisfactory to the Managers that is furnished to the Company, in form and substance satisfactory to the Managers, as to such matters as the Managers may reasonably request including, without limitation, that the issuance of the Interests (a) is made in accordance with and will not violate the Securities Act of 1933, as amended, or any other applicable federal, state or local law; (b) will not require the Company to register as an investment company under the Investment Company Act of 1940, as amended; (c) will not jeopardize the status of the Company as a partnership or proprietorship for federal income tax purposes or cause a termination of the Company pursuant to the then applicable provisions of the TBOC; (d) will not cause a termination of the Company under Code Sec. 708(b)(1)(B); and (e) will not cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Sec. 7704.  Any such admission is effective only after the new Member has executed and delivered to the Company a document including the new Member's notice address, and its agreement to be bound by this Agreement.  The provisions of this Section 3.4 shall not apply to Transfers of Interests.

**ARTICLE 4**
**Allocation of Income and Losses**

**4.1** **Allocation of Profits and Losses.**  Except as otherwise provided in Section 4.2 and Section 4.3 below, Profits (and items thereof) and Losses (and items thereof) for any Fiscal Year (or other applicable period) shall be allocated among the Members in proportion to their Percentage Interests.

-10-

**EXHIBIT 3**

**4.2** **Special Allocations.** The following special allocations will be made in the following order:

(a) The amount of items of Company expense and Loss shall first be allocated to Owen until his Adjusted Capital Account is reduced to zero. Thereafter, the amount of items of Company income and Profit shall first be allocated to Owen until his Adjusted Capital Account is restored to an amount equal to the Capital Contributions of Owen less any Distributions to Owen.

(b) Notwithstanding anything to the contrary in Section 4.1, the amount of items of Company expense and Loss allocated pursuant to this Article 4 to any Member shall not exceed the maximum amount of such items that can be so allocated without causing such Member to have an Adjusted Capital Account Deficit at the end of any taxable year. All such items in excess of the limitation set forth in this Section 4.2(b) shall be allocated first to Members who would not have an Adjusted Capital Account Deficit, pro rata in proportion to their Capital Account balances.

(c) If there is a net decrease in Company Minimum Gain (as defined in Reg. §§1.704-2(b)(2) and 1.704-2(d)) during a Fiscal Year so that an allocation is required by Reg. §1.704-2(f), then each Member shall be specially allocated items of income and gain for such year (and, if necessary, subsequent Fiscal Years) equal to such Member's share of the net decrease in Company Minimum Gain as determined by Reg. §1.704-2(g). Such allocations shall be made in a manner and at a time which will satisfy the minimum gain chargeback requirements of Reg. §1.704-2(f) and this Section 4.2(c) shall be interpreted consistently therewith.

(d) If there is a net decrease in the Member Nonrecourse Debt Minimum Gain (as defined in Reg. §1.704-2(i)(3)) during any Fiscal Year, any Member who has a share of such Member Nonrecourse Debt Minimum Gain (as determined in the same manner as partner nonrecourse debt minimum gain under Reg. §1.704-2(i)(5)) shall be specially allocated items of income or gain for such year (and, if necessary, subsequent Fiscal Years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain in the manner and to the extent required by Reg. §1.704-2(i)(4). This Section shall be interpreted in a manner consistent with such Reg.

(e) If a Member unexpectedly receives an adjustment, allocation, or distribution described in Reg. §§1.704-1(b)(2)(ii)(d)(4), (5) or (6), any of which causes or increases an Adjusted Capital Account Deficit in such Member's Capital Account, then such Member will be specially allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance created or increased by such adjustment, allocation, or distribution as quickly as possible; provided, however, an allocation pursuant to this Section 4.2(e) will be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 4 have been tentatively made as if this Section 4.2(e) were not in the Agreement. Deductions attributable to any Nonrecourse Liability (as defined in §1.704-2(b)(3) of the Regs.) shall be allocated among the Members in proportion to their respective Percentage Interests.

# EXHIBIT 3

(f)     Deductions attributable to any Member Nonrecourse Debt (as defined in Reg. §1.704-2(b)(4)) shall be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such deductions are attributable in accordance with Reg. §1.704-2(i).

(g)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code §734(b) or Code §743(b) is required, pursuant to Reg. §1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if such gain or loss increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regs.

(h)     If any Member makes a loan to the Company, or the Company makes a loan to any Member, and interest in excess of the amount actually payable is imputed under Code §§7872, 483, or 1271 through 1288 or corresponding provisions of subsequent Federal income tax law, then any item of income or expense attributable to any such imputed interest shall be allocated solely to the Member who made or received the loan and shall be credited or charged to its Capital Account, as appropriate.

(i)     The allocations set forth in this Section 4.2 (collectively the "Regulatory Allocations") are intended to comply with certain requirements of Reg. §1.704-1 and § 1.704-2. Notwithstanding any other provisions of this Section 4 (other than the Regulatory Allocations), the Members shall, with the advice and assistance of the Company's tax accountants, take the Regulatory Allocations into account in allocating other Profits, Losses, and items of income, gain, loss, deduction and Code §705(a)(2)(B) expenditures among the Members so that, to the extent possible, the net amount of such allocations of other Profits, Losses, and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

**4.3     Allocation and Other Rules**.

(a)     In the event Members are admitted to the Company pursuant to this Agreement on different dates, the Profits (or Losses) allocated to the Members for each Fiscal Year during which Members are so admitted shall be allocated among the Members in proportion to their Percentage Interest during such Fiscal Year in accordance with §706 of the Code, using any convention permitted by law and selected by the Managers.

(b)     For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Managers using any method that is permissible under §706 of the Code and the Regs. thereunder.

(c)     Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be

-12-

<span style="color:red">**EXHIBIT 3**</span>

divided among the Members in the same proportions as they share Profits and Losses for the Fiscal Year in question.

(d)     Income, gain, loss or deduction with respect to any property contributed by a Member shall, solely for tax purposes, be allocated among the Members, to the extent required by Code §704(c) and the related Regs. under Code §§704(b) and 704(c), to take account of the variation between the adjusted tax basis of such property and its Gross Asset Value at the time of its contribution to the Company.  If the Gross Asset Value of any Company property is adjusted, as provided in Reg. §1.704-1(b)(2)(iv), then subsequent allocations of income, gain, loss and deduction shall be as provided in Code §704(c) and the related Regs.  Allocations under this Section 4.3(d) shall be made by the Managers in accordance with the remedial or traditional method (as determined by the Managers) set forth in Reg. §1.704-3(b) and (d) and are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, or other items or distributions under any provision of this Agreement.

**4.4     Withholding.**  The Company shall comply with withholding requirements under Federal, state and local law and shall remit amounts withheld to and file required forms with the applicable jurisdictions.  To the extent the Company is required to withhold and pay over any amounts to any authority with respect to distributions or allocations to any Member, the amount withheld shall be treated as a distribution in the amount of the withholding to that Member.  In the event of any claimed over-withholding, Members shall be limited to an action against the applicable jurisdiction.  If the amount withheld was not withheld from actual distributions, the Company may, at its option, (a) require the Member to reimburse the Company for such withholding or (b) reduce any subsequent distributions by the amount of such withholding.  Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of and in fulfilling its withholding obligations.

**4.5     Revaluation of Property.**

(a)     The assets of the Company shall be revalued on the books of the Company to equal their fair market value in accordance with Regs. Section 1.704-1(b)(2)(iv)(f) at the following times: (i) the day immediately preceding the acquisition of an additional Interest in the Company by any existing or new Member in exchange for more than a de minimis Capital Contribution to the equity capital of the Company pursuant to this Agreement; (ii) on the day of any withdrawal of more than a de minimis portion of the Capital Account pursuant to this Agreement in consideration for an Interest in the Company; (iii) the termination of the Company for Federal income tax purposes, other than a termination pursuant to Section 708(b)(1)(B) of the Code; and (iv) the occurrence of any other event upon which the Managers believe such revaluation is appropriate.  Upon revaluation of the Company's assets pursuant to this paragraph, (i) the fair market value of the assets shall be determined by the Managers and (ii) each Member's Capital Account shall be adjusted as if such assets were sold for their fair market values and the Profits and Losses recognized on such sales were allocated to the Members in accordance with Section 4.1.

**EXHIBIT 3**

(b)      For purposes of <u>Section 4.1</u>, the Fiscal Year in which the assets of the Company are revalued pursuant to <u>Section 4.5(a)</u>, shall be treated as two separate Fiscal Years, one beginning on the first day of the Fiscal Year and ending on the day of the revaluation and the other beginning on the day immediately following the revaluation and ending on the last day of the Fiscal Year, and Profits and Losses shall be allocated to the Members separately for each portion of the Fiscal Year based on operations for such portion of the year as reflected by a closing of the Company's books.  Analogous divisions of the Fiscal Year into multiple Fiscal Years will be made if there be more than one revaluation of assets in any Fiscal Year.

**4.6      Capital Accounts.**  A Capital Account (herein so called) shall be established and maintained for each Member on the books of the Company in compliance with Reg. §§1.704-1(b)(2)(iv) and 1.704-2, as amended.

## ARTICLE 5
### Distributions and Withdrawals

**5.1      Distributions.**  Subject to <u>Section 5.3</u> and <u>Section 10.3</u>, distributions of Available Cash shall be made at such times and in such manner as shall be approved by the Managers. Any such distribution shall be made to the Members as follows:

(a)      first, to Members making loans to the Company until the full amount of such loans (principal and accrued interest) are repaid in full;

(b)      second, to Owen until the full amount of his Capital Contributions are reduced to zero;

(c)      next, to the remaining Members in proportion to their Capital Contributions until the full amount of such Capital Contributions are reduced to zero; and

(d)      finally, to the Members in proportion to their Percentage Interests as of the day on which such distribution is made.

**5.2      Withdrawals of Capital Account Balance.**  Subject to <u>Section 10.1</u> and <u>Section 10.3</u>, a Member may withdraw all or any portion of its Capital Account balance at such time or times and in such manner as shall be approved by the unanimous consent of the Members.  Any Member withdrawing the entire balance of its Capital Account shall, upon the completion of such withdrawal, be deemed to have withdrawn from the Company pursuant to <u>Article 10</u>.

**5.3      Tax Distribution**.    Prior to making any distributions pursuant to this <u>Section 5</u>, the Company shall distribute to each member in cash, at least ten (10) days before the date that any quarterly estimated federal income tax payments are due, an amount (a "Tax Distribution") equal to (a) the product of (i) the highest combined federal tax rate (expressed as a percentage) applicable to any Member assuming such Member was subject to the highest marginal tax rate and (ii) the aggregate federal taxable income expected to be allocated to such Member in respect of such Fiscal Year, minus (b) the aggregate amount of all distributions pursuant to Section 5.1(b) actually (not constructively) made to such Member with respect to such Fiscal Year.  Tax

-14-
# EXHIBIT 3

Distributions shall not be deemed to reduce any Member's Capital Account but shall be deemed interest free advances on each Member's distributions and shall reduce such Member's rights to future distributions (other than Tax Distributions).  In the event the Company is unable to pay a Tax Distribution, no Member shall be liable to make a Capital Contribution to the Company for this purpose and no Member shall be required to disgorge and pay back to the Company any Tax Distribution previously received by such Member.

**5.4**     **Non Cash Distributions**.  The Members shall not have any right to demand distributions other than cash.

**5.5**     **Distributions in Kind**.   If the Company makes a distribution in kind and such distribution is subject to withholding or other taxes payable by the Company on behalf of any Member (the "Withheld Amount"), the Company shall notify such Member as to the extent (if any) of the Withheld Amount and such Member shall make a prompt payment to the Company of the Withheld Amount.

### ARTICLE 6
### Accounting and Management

**6.1**     **Books and Records.**  Proper and complete records and books of account shall be kept by the Managers in accordance with the TLLCL in which shall be entered fully and accurately all transactions and other matters relative to the Company's business as are usually entered into records and books of account maintained by Persons engaged in businesses of a like character, including a Capital Account for each Member.  The Company books and records shall be kept on such method of accounting as the Managers shall determine.  The determinations of the Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon all Members so long as that determination is not inconsistent with any express term of this Agreement.  The books and records shall at all times be maintained at the principal office of the Company and shall be open to the examination and inspection of the Members or their duly authorized representative for a proper purpose during reasonable business hours at the sole cost and expense of the inspecting or examining Member.  The Company shall maintain at its office and make available to each Member or any designated representative of a Member a list of names and addresses of, and Interests owned by, all Members.  The Company shall maintain at its registered office those books and records required to be kept pursuant to the applicable sections of the TLLCL.

**6.2**     **Tax Returns.**  The Company shall file a Federal income tax return and all other tax returns required to be filed by the Company for each Fiscal Year or part thereof, and shall provide, within ninety (90) days following the end of such Fiscal Year, or as promptly as reasonably practicable thereafter, to each Person who at any time during such Fiscal Year was a Member with a copy of the Company's Federal, state and local income tax or information returns.

**6.3**     **Partnership Representative.**

**EXHIBIT 3**

(a)     For purposes of Code, the "Partnership Representative" shall be Brandon Wilkins, or, if no longer a Member, another Member appointed by the Managers as "Partnership Representative", in each case for so long as such Member remains a member in the Company. The Partnership Representative shall keep the Members fully informed of any inquiry, examination or proceeding with respect to any income tax matter involving the Company.

(b)     The Partnership Representative shall promptly notify Members who do not qualify as "notice partners" within the meaning of Code Sec. 6231(a)(i) of the beginning and completion of an administrative proceeding at the Company level promptly upon such notice being received by the Partnership Representative.

### ARTICLE 7
### Powers, Rights and Duties of Members

**7.1     Limitations.**  Other than as set forth in this Agreement, the Members shall not participate in the management or control of the Company's business nor shall they transact any business for the Company, nor shall they have the power to act for or bind the Company, said powers being vested solely and exclusively in the Managers.  The Members shall have no interest in the properties or assets of the Company, or any equity therein, or in any proceeds of any sales thereof, by virtue of acquiring or owning an Interest in the Company.

**7.2     Liability.**  Subject to the provisions of the TLLCL, no Member shall be liable for the repayment, satisfaction or discharge of any Company liabilities in excess of the balance of the Capital Account of such Member.

**7.3     Priority.**  Except as otherwise provided in this Agreement, no Member shall have priority over any other Member as to Company allocations or distributions.

**7.4     No Competition; Confidentiality.**  For so long as a Member owns a Membership Interest in the Company, neither the Member (nor its owners in the case of a Member which is an entity) will participate in (as an equity owner, partner, Managers, officer or employee), or enter into a vendor or independent contractor relationship with any entity that is in competition with the business of the Company. The Members will at all times treat as confidential and hold as such all of the trade secrets, equipment and practices of the Company and, refrain from using or disclosing any such Company information except in connection with this Agreement.  However, the Members expressly acknowledge and agree that Brian Owen shall not be bound by the non-competition covenant of this paragraph and shall have complete freedom to engage in or transact any business that he desires.

**7.5     Meetings of Members.**  An annual meeting of the Members for the transaction of such business as may properly come before the meeting shall be held on such date and at such time as the Managers shall specify in the notice of the meeting, which shall be delivered to each Member at least twenty (20) days prior to such meeting. Special meetings of the Members may be called by the Managers or by Members having among them at least ten percent (10%) of the Percentage Interests. Any such meeting shall be held on such date and at such time as the Person calling such meeting shall specify in the notice of the meeting, which shall be delivered to each

-16-
### EXHIBIT 3

Member at least ten days prior to such meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) for such meeting may be conducted at such meeting. Unless otherwise expressly provided in this Agreement, at any meeting of the Members, all of the Members, represented either in person or by proxy, shall constitute a quorum for the transaction of business, and the unanimous approval of the Members shall be the act of the Members.

### ARTICLE 8
### Powers, Rights and Duties of Managers

      **8.1**    **Authority.**  Subject to the provisions of <u>Section 8.3</u>, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Managers. No Member in its capacity as a Member has the right, power, or authority to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company. Without limiting the generality of the foregoing and in addition to other powers specified in this Agreement, the Members hereby authorize the Managers, on behalf of the Company, to, in each case subject to <u>Section 8.2</u> and <u>Section 8.3</u>, to:

      (a)    enter into, make, and perform contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company and make all decisions and waivers thereunder;

      (b)    open and maintain bank and investment accounts and arrangements, draw checks and other orders for the payment of money, and designate individuals with authority to sign or give instructions with respect to those accounts and arrangements;

      (c)    maintain the assets of the Company in good order;

      (d)    to the extent that funds of the Company are available therefor; pay debts and obligations of the Company;

      (e)    acquire, utilize for Company purposes, and dispose of any asset of the Company;

      (f)    borrow money or otherwise commit the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

      (g)    select, remove, and change the authority and responsibility of lawyers, accountants, and other advisers and consultants;

      (h)    obtain insurance for the Company; and

      (i)    designate the location for the operation of Company property.

# EXHIBIT 3

**8.2      Powers and Duties of Managers; Expenses of the Company.**  In managing the business and affairs of the Company and exercising its powers, the Managers shall act (a) consistent with and as limited by the Annual Budget pursuant to Section 8.9; (b) collectively through resolutions adopted at meetings and in written consents pursuant to Section 8.5 and Section 8.6, if there is more than one Manager; and (c) through committees and individual Managers to which authorities and duties have been delegated pursuant to Section 8.7.  No Manager has the right, power, or authority to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company, except in accordance with the immediately preceding sentence. Decisions or actions taken by the Managers in accordance with this Agreement (including this Section 8.2 and Section 8.3) shall constitute decisions or actions by the Company and shall be binding on each Managers, Member, officer, and employee of the Company.  The Company shall pay, and the Managers shall not be obligated to pay, all expenses incurred by or on behalf of the Company.  The Managers may, in the Managers's discretion, advance funds to the Company for the payment of these expenses and shall be entitled to the reimbursement of any funds so advanced.

**8.3      Matters Requiring Consent of Members.**  Notwithstanding any power or authority granted the Managers under TBOC, TLLCL, the Certificate, or this Agreement, except as expressly set forth in this Agreement, the Managers may not make any decision or take any action for which the consent of a Majority Interest or other consent of the Members is expressly required by the Certificate or this Agreement, without first obtaining such consent.

(a)      The Managers may not make any of the following decisions or actions with respect to the Company without first obtaining the unanimous written consent of the Members:

(i)      The entering into by the Company of a Fundamental Business Transaction;

(ii)      The sale or other disposition of all or substantially all of the assets of the Company, whether in one disposition or a related series of dispositions;

(iii)      Cause or permit the Company to engage in any activity that is not consistent with the purposes of the Company as set forth in Section 1.3 hereof;

(iv)      Knowingly do any act in contravention of this Agreement;

(v)      Knowingly do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Agreement;

(vi)      Possess any Company assets or property, or assign rights in specific Company assets or property for other than a Company purpose;

-18-

**EXHIBIT 3**

(vii) Cause the Company to voluntarily take any action that would cause a bankruptcy of the Company;

(viii) Cause the Company to acquire any equity or debt securities of any Member or any Affiliates of a Member, or otherwise make loans to any Member or any Affiliates of a Member;

(ix) Execute any bond, guaranty, indemnity or accommodation endorsement relating to a debt of a party other than the Company;

(x) Confess any judgment or make an assignment for the benefit of creditors or file a voluntary petition under any federal or state bankruptcy or insolvency law;

(xi) Change the designation of the holder of legal title of all or any portion of the assets or property owned by the Company; or

(xii) Establish the salary of a Manager or an Affiliate of a Manager or any person described in Code Section 267(b) and any successor provision thereto with respect to the Managers.

(b) The Managers may not make any of the following decisions or actions with respect to the Company without first obtaining the written consent of a Super Majority of the Members:

(i) Adopt or take action pursuant to the Annual Budget;

(ii) Unless specifically contemplated in the approved annual Budget, the sale or disposition of any assets which have an aggregate fair market value of in excess of $5,000.00; or

(iii) Unless specifically contemplated in the approved annual Budget, the entering into by the Company of any contract, lease (whether the Company is the lessor or lessee) or other agreement or arrangement, whether oral or written, imposing any obligation on the Company, or otherwise having a value of more than $5,000.00.

**8.4 Selection of Managers.** The Company shall have three Managers. The number of Managers of the Company may be changed by the written consent of a Super Majority of the Members. The initial Managers of the Company shall be the Persons named in the Certificate as the initial Managers. Managers must be Members (or, in the case of a Member that is an entity, an equity holder of such Member). Each Manager (whether an initial or a successor Manager) shall cease to be a Manager upon the earliest to occur of any of the following events: (a) such Manager shall be removed, with or without cause, by the affirmative vote of a Super Majority of the Members at a meeting of the Members called for that purpose; (b) such Manager shall resign

**EXHIBIT 3**

as a Manager, by giving notice of such resignation to the Members; (c) such Manager's successor is duly elected in accordance with the terms hereof; or (d) such Manager shall die, dissolve (unless its business is continued without the commencement of liquidation or winding up), or become bankrupt (as defined in the TBOC). Any vacancy in any Manager position (whether created by an increase in the number of Managers or otherwise) may be filled by the approval of a Super Majority of the Members at a meeting of the Members called for that purpose.

**8.5** **Meetings of Managers.**  If there is more than one Manager, regular meetings of the Managers may be held on such dates and at such times as shall be determined by the Managers, with notice of the establishment of such regular meeting schedule being given to each Manager that was not present at the meeting at which it was adopted. Special meetings of the Managers may be called by any Manager by notice thereof (specifying the place and time of such meeting) that is delivered to each other Manager at least 24 hours prior to such meeting. Neither the business to be transacted at, nor the purpose of, such special meeting need be specified in the notice (or waiver of notice) thereof. Unless otherwise expressly provided in this Agreement, at any meeting of the Managers, a majority (by number) of the Managers shall constitute a quorum for the transaction of business, and an act of a majority (by number) of the Managers who are present at such a meeting at which a quorum is present shall be the act of the Managers.

**8.6** **Provisions Applicable to All Meetings.**  In connection with any meeting of the Managers, Members, or any committee of the Managers, the following provisions shall apply:

(a)  Any such meeting shall be held at the principal place of business of the Company, unless the notice of such meeting (or resolution of the Managers or committee, as applicable) specifies a different place, which need not be in the State of Texas.

(b)  Attendance of a Person at such meeting (including pursuant to Section 8.6(e)) shall constitute a waiver of notice of such meeting, except where such Person attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c)  A Person may vote at such meeting by a written proxy executed by that Person and delivered to another Manager, Member, or member of the committee, as applicable. A proxy shall be revocable unless it is stated to be irrevocable.

(d)  Any action required or permitted to be taken at such a meeting may be taken without a meeting, without prior notice, and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by that number of Managers, Members, or members of the committee, as applicable, that would be required to approve the action at a meeting at which all of the Managers, Members or committee members, as applicable, were present.  If an action is approved by less than unanimous written consent, those Persons not signing the consent who would otherwise have been entitled to vote thereon shall be provided a copy of same as soon as reasonably possible.

**EXHIBIT 3**

(e)     Managers, Members, or members of the committee, as applicable, may participate in and hold such meeting by means of conference telephone, videoconference, or similar communications equipment by means of which all Persons participating in the meeting can hear each other.

**8.7     Committees of Managers; Delegation of Authority to Individual Managers.** If there is more than one Manager, the Managers may designate one or more committees, each of which shall be comprised of one or more of the Managers, and may designate one or more of the Managers as alternate members of any committee. Except for matters that cannot be delegated to such a committee pursuant to the TBOC, any such committee, to the extent provided in the resolution establishing it, shall have and may exercise all of the authority that may be exercised by the Managers. Regular and special meetings of such committee shall be held in the manner designated by the Managers or, if not so designated, by such committee. The Managers may dissolve any committee at any time. In addition, the Managers may delegate to one or more Managers such authority and duties, and assign to them such titles, as the Managers may deem advisable. Any such delegation may be revoked at any time by the Managers.

**8.8     Officers.** The Managers may designate one or more Persons to be officers of the Company and any officers so designated shall have such title, authorities, and duties as the Managers may delegate to them. Any officer may be removed as such, either with or without cause, by the Managers.

(a)     The President, if one is designated, shall act as the chief executive officer of the Company, in which case he shall, subject to the express provisions of this Agreement, have general and active management of the business of the Company and shall see that all orders and resolutions of the Managers are carried into effect.  Subject to the express provisions of this Agreement, the President shall have the general powers and duties of supervision and management usually vested in the office of the chief executive officer of a limited liability company.  Subject to the express provisions of this Agreement, the President shall execute bonds, mortgages and other contracts or instruments except where the execution thereof shall be expressly delegated by the Managers to some other officer or agent of the Company.  Subject to the express provisions of this Agreement, the President shall be the chief administrative officer of the Company and responsible for the active day-to-day management of the business of the Company and shall perform such other functions and duties commonly incident to the office and shall also perform such other functions and duties as may from time to time be designated by the Managers of the Company.

(b)     Subject to the express provisions of this Agreement, the Vice President(s), if designated, shall, in the absence or disability of the President, perform the duties and exercise the powers of the President; and shall have such other powers and perform such other duties commonly incident to the office and shall also perform such other duties as the Managers may from time to time prescribe or as the President may from time to time delegate to him.

(c)     The Secretary, if one is designated, shall attend all meetings of the Managers and Members and record all proceedings of such meetings in a book to be kept for that purpose.  Subject to the express provisions of this Agreement, he shall give, or cause to be given,

-21-
**EXHIBIT 3**

notice of all meetings of Managers and Members, and shall perform such other duties commonly incident to the office and shall also perform such other duties as may be prescribed by the Managers, under whose supervision he shall be.  The Assistant Secretaries, if they are designated, in the order of their seniority, unless the Managers shall otherwise determine, shall, in the absence or disability of the Secretary, perform the duties and exercise the powers of the Secretary.  They shall perform such other duties and have such other powers as the Managers may from time to time prescribe.

(d)     The Treasurer, if one is designated, shall have custody of the Company's funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company, and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Managers.  The Treasurer shall disburse the funds of the Company as may be ordered by the Managers, taking proper vouchers for such disbursements, and shall render to the President and the Managers at their regular meetings, or when the Managers so requires, an account of all his transactions as Treasurer and of the financial condition of the Company.  If so required by the Managers, the Treasurer shall give the Company a bond in such sum and with such surety or sureties as shall be satisfactory to the Managers for the faithful performance of the duties of his office and for the restoration to the Company, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession or under his control belonging to the Company.  The Assistant Treasurers, if any are designated, in the order of their seniority, unless otherwise determined by the Managers, shall, in the absence or disability of the Treasurer, perform the duties and exercise the powers of the Treasurer.  They shall perform such other duties and have such other powers as the Managers may from time to time prescribe.

**8.9     Annual Budget**.  As soon as possible after the execution of this Agreement and then on or before December 1 each year commencing in 2020, the President shall prepare and submit to the Members a business plan and financial budget for the upcoming fiscal year (the "Annual Budget").  The Annual Budget shall include line items for all budgeted operating components, including employee salaries and the expected equipment and fixed asset purchases and dispositions for the budgeted period.  After review and comment by the Members, and revision if necessary, the Annual Budget shall not be adopted and effective except upon the affirmative vote of at least a Super Majority of the Partners.

**8.10     Other Activities and Competition; Other Investments by the Managers and its Affiliates.**  A Manager shall not be required to manage the Company as the Manager's sole and exclusive function.  Any Manager, the Manager's Affiliates and agents, officers, directors and employees of the Manager and the Manager's Affiliates may engage in or possess any interests in noncompeting business ventures and may engage in other noncompeting activities of every kind and description independently or with others in addition to those relating to the Company.  Without limiting the generality of the foregoing, a Manager, the Manager's Affiliates and any agent, officer, director or employee of the Manager or the Manager's Affiliates may act as a director of any noncompeting corporation, trustee of any trust, partner of any noncompeting partnership or administrative officer of any noncompeting business entity, and may receive compensation for service as a director, employee, advisor, consultant or Manager with respect to,

**EXHIBIT 3**

or participate in profits derived from, investments in or of any such noncompeting corporation, trust, partnership or other business entity. This restriction shall not apply to the incidental ownership of a publically held and traded security. The Managers will at all times treat as confidential and hold as such all of the trade secrets, equipment and practices of the Company and, refrain from using or disclosing any such Company information except in connection with this Agreement.

**8.11   Liability.** No Manager or any of such Manager's Affiliates nor any officer, director, agent or employee of such Managers or any of their Affiliates shall be personally liable for the return of any portion of the Capital Contributions of the Members; the return of these Capital Contributions shall be made solely from assets of the Company. No Manager or any of such Manager's Affiliates nor any officer, director, agent or employee of such Manager or any of their Affiliates shall be required to pay to the Company or the Members any deficit in a Member's Capital Account upon winding up or otherwise. The Members shall not have the right to demand or receive property other than cash for their Interest. No Manager or any of such Manager's Affiliates or any officer, director, agent or employee of such Manager or any of their Affiliates shall be liable, responsible or accountable to the Company or the Members for (a) any act or omission performed or omitted by them, including without limitation, those acts performed or omitted on advice of legal counsel, accountants, brokers or consultants of the Company, or for any costs, damages or liabilities arising therefrom, or by law, unless that act or omission was performed or omitted fraudulently or in bad faith or constituted gross negligence or willful misconduct, (b) any tax liability imposed on the Company or the Members or (c) any loss due to the negligence, dishonesty or bad faith of any employee, broker, consultant or other agent of the Company selected, engaged or retained in good faith by such Manager.

**8.12   Indemnification.**

(a)        Each Person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she or a Person of whom he or she is the legal representative is or was a Manager, employee or agent of the Company or is or was serving at the request of the Company as a Manager, managing member, employee or agent of any other corporation or of a partnership, joint venture, trust or other enterprise (hereinafter an "Indemnified Party"), whether the basis of such proceeding is alleged action in an official capacity as a Manager, employee or agent of the Company or in any other capacity while serving as a Manager, employee or agent of the Company, shall be indemnified and held harmless by the Company to the fullest extent authorized by the TLLCL, against all expense, liability and loss (including, without limitation, attorneys' fees, judgments, fines and amounts paid or to be paid in settlement) reasonably incurred by such Indemnified Party in connection therewith; provided, however, that except as provided in this Article with respect to proceedings seeking to enforce rights to indemnification, the Company shall indemnify any such Indemnified Party seeking indemnification in connection with a proceeding (or part thereof) initiated by such Indemnified Party only if such proceeding (or part thereof) was authorized by unanimous approval of the Members; provided further, however, no such Person shall be entitled to indemnification under this paragraph if the acts, omissions or alleged acts or omissions of such Person or any of its Affiliates upon which such actual or threatened action,

-23-
**<span style="color:red">EXHIBIT 3</span>**

proceeding or claim are based were performed or omitted fraudulently or in bad faith or constituted gross negligence or willful misconduct.

(b)     The Company shall pay or reimburse the reasonable expenses incurred in defending any such action or proceeding in advance of its final disposition (hereinafter an "advancement of expenses").

(c)     If a claim under this Article is not paid in full by the Company within thirty (30) days after a written claim has been received by the Company, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be twenty (20) days, the Indemnified Party may at any time thereafter bring suit against the Company to recover the unpaid amount of the claim.  If successful in whole or in part in any such suit, or in a suit brought by the Company to recover an advancement of expenses pursuant to the terms of an undertaking, the Indemnified Party shall be entitled to be paid also the expense of prosecuting or defending such suit.  In any suit brought by the Indemnified Party to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Company to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnified Party is not entitled to be indemnified, or to such advancement of expenses, under this section shall be on the Company.

**8.13   Compensation**.   The Managers shall be entitled to such compensation for services rendered to the Company as unanimously approved by the Members; provided, however, that any such compensation must comply with Section 704(e) of the Code, if applicable.  The Managers' compensation will be treated as a guaranteed payment for services rendered.  The Managers will also be entitled to reimbursement for all reasonable and necessary business expenses incurred in managing the Company.   If the Company's cash flow is insufficient to pay the Managers' compensation, the unpaid portion of the compensation may be deferred and if deferred will bear interest at the Regular Interest Rate.

**8.14   Ownership of Company Property**.  All Property will be owned by and in the name of the Company and not in the name of any Member.  Each Member expressly waives the right to require partition of any Property.  The Members will execute any documents that may be reasonably necessary to reflect the Company's ownership of its Property and shall record their documents in the public offices that may be necessary or desirable in the discretion of the Managers.  No Member shall have the right or power to demand Property other than cash in return for its contribution, but may receive distributions in kind at the sole discretion of the Managers.

## ARTICLE 9
### Transfers of Interests by Members; Preemptive Rights

**9.1     Transfer and Assignment of Members' Interests; Substituted Members.**

(a)     Subject to Section 9.1(b), if applicable, a Member may Transfer all or a portion of that Member's Interest in the Company (including any beneficial interest therein), provided the following conditions are met:

-24-
**<span style="color:red">EXHIBIT 3</span>**

(i)     the Transferee executes documents reasonably satisfactory to the Managers pursuant to which the Transferee agrees to be bound by this Agreement and any amendments hereto;

(ii)     the Transferee assumes, if so requested by the Company or by the Managers, the obligations, if any, of the Transferor to the Company;

(iii)     all certificates or other instruments shall have been recorded or filed in the proper records of each jurisdiction in which such recordation or filing is necessary to qualify the Company to conduct business or to preserve the limited liability of the Members under the laws of the jurisdiction in which the Company is doing business; and

(iv)     the Transferee represents, and, at the request of the Managers, furnishes to the Company an opinion of counsel satisfactory to the Managers, in form and substance satisfactory to the Managers, as to such matters as the Managers may reasonably request including, without limitation, that such Transfer (1) was made in accordance with and would not violate the Securities Act of 1933, as amended, or any other applicable Federal, state or local law; (2) would not require the Company to register as an investment company under the Investment Company Act of 1940, as amended; (3) would not jeopardize the status of the Company as a partnership or proprietorship for Federal income tax purposes or cause a termination of the Company pursuant to the then applicable provisions of the TLLCL; (4) would not cause a termination of the Company under Code Sec. 708(b)(1)(B); and (5) would not cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Sec. 7704.

(b)     Except with respect to a Permitted Transfer or as set forth in <u>Section 9.2</u>, any Transfer by a Member shall be subject to a right of first refusal as provided herein.  The Transferor shall give the Company written notice of the proposed Transfer which shall state the name of the proposed Transferee, the portion of the Transferor's Interest proposed to be transferred, the proposed cash purchase price or, if none, the fair market value of such Interest, as determined under <u>Section 9.1(c)</u> (without regard to this right of first refusal), and any other material terms of such proposed Transfer.  The Company shall, for a period of the later of thirty (30) days after such notice is given or thirty (30) days after the value of such Interest is determined pursuant to <u>Section 9.1(c)</u>, have the right to elect to purchase all or any part of such Interest at the proposed cash purchase price or, if none, the fair market value of such Interest, as determined under <u>Section 9.1(c)</u> (without regard to this right of first refusal) and on the proposed terms. To the extent that the Company does not elect to purchase such Interest, each other Member shall have thirty (30) additional days from the date on which the Company's right to acquire such Interest expires in which to elect to buy all or any part of the then-remaining portion of such Interest at the proposed cash purchase price or, if none, the fair market value of such Interest, as determined under <u>Section 9.1(c)</u> (without regard to this right of first refusal) and on the proposed terms.  The Members electing to purchase such Interest shall be entitled to elect to purchase a portion of such Interest that is relative to the proportion that each such Member's

**EXHIBIT 3**

Percentage Interest bears to the total Percentage Interests of all Members or in such other proportion as they shall agree upon.  If the Members fail to elect to purchase all of the Interest to which they are entitled to purchase, the Members who elected to purchase some of the Interest shall, for a period of five (5) days, be entitled to elect to purchase a portion of the remaining portion of the Interest that is relative to the proportion that each such Member's Percentage Interest bears to the total Percentage Interests of all such electing Members or in such other proportion as they shall agree upon.  This procedure shall be repeated until all of the Interest is covered by an election or until none of the Members desire to purchase any additional portion of the Interest.

(c)  Absent a proposed cash purchase price, the fair market value of the portion of the Transferor's Interest proposed to be transferred shall be determined as of the date written notice of the proposed transfer is provided to the Company as required by Section 9.1(b). The Company and the Transferor shall seek to reach agreement on the fair market value of such Interest.  Absent an agreement as to the fair market value, the Company shall obtain a qualified and independent appraiser (the "First Appraiser") to appraise the value of such Interest.  The First Appraiser shall determine the value of such Interest within thirty (30) days of the date of his or her appointment (the "First Appraisal").  In the event that the Company or the Transferor disagrees with the First Appraisal (the "Disagreeing Party"), the Disagreeing Party shall notify the other in writing within seven (7) days of the delivery of the First Appraisal by the First Appraiser to such Person, and within seven (7) days of delivery of said written notice, the Disagreeing Party shall appoint a second qualified and independent appraiser (the "Second Appraiser").  The Second Appraiser shall determine the value of such Interest within thirty (30) days of the date of his or her appointment (the "Second Appraisal").  If the Second Appraisal is within ten percent (10%) of the First Appraisal, the value of such Interest shall be the average of the First Appraisal and the Second Appraisal.  If the Second Appraisal is not within ten percent (10%) of the First Appraisal, then within seven (7) days following the delivery of the Second Appraisal to the Disagreeing Party, the First Appraiser and the Second Appraiser shall select a third qualified and independent appraiser (the "Third Appraiser" and together with the First Appraiser and the Second Appraiser, each an "Appraiser") who, within thirty (30) days of his or her appointment, shall determine the value of such Interest (the "Third Appraisal").  The Third Appraisal shall be binding.  The appraised value of such Interest determined in this Section 9.1(c) shall be final and binding upon all parties.  All expenses of the First Appraisal and the Third Appraisal shall be paid in equal shares by (x) the Company (and, with respect to the First Appraisal, shall serve to reduce the purchase price of the Interest by the Company by such expenses), and (y) the Transferor.  All expenses of the Second Appraisal shall be paid by the Disagreeing Party.

(d)  The closing of the sale and purchase of any such Interests pursuant to Section 9.1(b), shall take place at the offices of the Company on such date as the Transferor and the Company and/or the purchasing Member(s), as applicable, shall agree; provided, however, that in the absence of any such agreement, the closing shall occur on the thirtieth (30th) day after the later to occur of (i) the expiration of the last applicable time period described in Section 9.1(b), or (ii) if fair market value is used as the purchase price, the date that the fair market value of the Interest is determined as provided in Section 9.1(c).  Payment of the purchase price for the Interest shall be made as follows: unless otherwise agreed to by the parties to the purchase

**EXHIBIT 3**

transaction, on the closing date of the purchase, the Company and/or the purchasing Member(s), as applicable, shall deliver to the Transferor a cash down payment equal to twenty percent (20%) of the total purchase price attributable to each such purchaser, and the balance shall bear interest at a fixed rate per annum equal to the Regular Interest Rate in effect on the date of purchase, adjusted on an annual basis, which shall be paid in quarterly installments of principal and interest over a period of five (5) years.

(e)     If the Company and/or one or more of the Members elect within the applicable periods specified in Section 9.1(b) to purchase in the aggregate, all, but not less than all, of the Interests covered by the notice described in Section 9.1(b), the Transferor will not have the right to sell any portion of such Interest to the proposed Transferee identified in such notice. If (i) the applicable time periods described in Section 9.1(b) above expire and neither the Company nor a Member has notified the Transferor of its intent to purchase, collectively, all of the Interests that are the subject of the proposed Transfer as of such date, or (ii) the Transferor receives a rejection in writing by the Company and the other Members with respect to their option to purchase all or any portion of the Interest that is the subject of the proposed Transfer, then the Transferor will be free to Transfer all of the remaining Interests to the proposed Transferee at a price and upon terms no more favorable to the proposed Transferee than as set forth in the notice described in the second sentence of Section 9.1(b) within thirty (30) days thereafter.  If the sale to the proposed Transferee is not so consummated within such time period, the terms of this Section 9.1 will again be applicable to a Transfer of Interests by such Member.

(f)     The Transferee of a Member's Interest in the Company may be admitted to the Company as a Substituted Member with respect to the Transferred Interest only upon the receipt of the prior written consent of the Managers and the unanimous written consent of the Members, which consent may be given or withheld in the sole discretion of the Managers and each such Member.  Unless a Transferee of a Member's Interest in the Company is admitted as a Substituted Member with respect to the Transferred Interest in this Section 9.1(f), the Transferee shall have none of the powers of a Member hereunder with respect to the Transferred Interest and shall only have such rights of an assignee under the TLLCL with respect to the Transferred Interest as are consistent with the other terms and provisions of this Agreement.

(g)     Unless a Transferee of a Member's Interest becomes a Substituted Member with respect to the Transferred Interest, such Transferee shall have no right to obtain or require any information or account of Company transactions, or to inspect the Company's books, or to vote on Company matters.  Such a Transfer shall merely entitle the Transferee to receive the share of distributions, income and losses to which the Transferor otherwise would be entitled with respect to the Transferred Interest.  No Transferee of a Member's Interest shall become a Substituted Member with respect to the Transferred Interest unless such Transfer shall be made in compliance with this Section 9.1.

(h)     All expenses incurred by the Company in connection with any Transfer or substitution of a Member pursuant to this section shall be paid by the Transferor prior to the time of the Transfer or substitution (including, without limitation, any fees and costs of the preparation, filing and publishing of any amendment to this Agreement or to the Articles, if any, and any legal and other fees, expenses and costs of any investigation and preparation, in

**EXHIBIT 3**

connection with any action, proceeding or investigation related to any Transfer or attempted Transfer by a Member of a Member's Interest or in connection with the admission into the Company of the Transferee).  The Transferor also will indemnify the Company and the Managers against any losses, claims, damages or liabilities to which any of them may become subject in connection therewith.  The reimbursement and indemnity obligations of the Transferor under this paragraph shall be in addition to any liability which the Transferor may otherwise have, shall extend upon the same terms and conditions to the Company and the Managers, shall inure to the benefit of any successors and assigns of the Company and the Managers and shall survive any termination of this Agreement.

(i)  The Transfer of a Member's Interest and the admission of a Substituted Member shall not be cause for winding up of the Company.

(j)  Notwithstanding any contrary provisions of this Section 9.1, a Member is not prohibited from making, and is specifically permitted to make, the following transfers without complying with any of the provisions of this Section 9.1, other than Section 9.1(a), (each a "Permitted Transfer"):

(i)  A sale, gift, bequest, or other Transfer pursuant to the laws of intestacy, to any member of the Transferor's Immediate Family or to a trustee of a trust, the beneficiaries of which consist entirely of the Transferor Member, one or more members of the Transferor Member's Immediate Family, and the spouse of the Transferor Member and/or one or more members of the Transferor Member's Immediate Family;

(ii)  A Transfer to a corporation, partnership, Limited Liability Company or other form of business entity in which the Transferor and/or members of the Transferor's Immediate Family and their spouses are the sole equity interest owners;

(iii)  A Transfer pursuant to the provisions of a trust that is a Member to its beneficiaries or a transfer from a corporation, partnership, limited liability company or other form of business entity that is a Member to its shareholders, partners, members or other owners, provided such beneficiaries, shareholders, partners, members or other owners are member of the Immediate Family of the Transferor Member who made the initial Transfers to such trust or other entity; or

(v)  A Transfer pursuant to the provisions of Section 10.1(b).

In the event of any Permitted Transfer, the Transferee shall automatically be admitted to the Company as a Substituted Member holding a transferred Membership Interest, and the transferred Membership Interest shall continue to be subject to the restrictions on Transfer set forth in this Article 9 as if still owned by the transferring Member.

**9.2  Right to Treat Successor-in-Interest as Assignee.**

-28-

<span style="color:red">**EXHIBIT 3**</span>

(a)     Upon the death, divorce, bankruptcy, Disability, winding-up and termination (in the case of a Member that is a partnership, limited liability company or corporation), termination (in the case of a Member that is a trust), change in control of a Person that is a Member, withdrawal in contravention of Article 10, or occurrence of an event described in the applicable sections of the TLLCL (each a "Section 9.2 Event") with regard to a Member (the "Assigning Member"), except for a Section 9.2 Event that results in a Permitted Transfer, the Managers shall have the right to treat the successor(s)-in-interest of the Assigning Member (individually, an "Assignee", and collectively, the "Assignees") as assignees of the Interest in the Company of the Assigning Member (the "Assignee Interest"), with only such rights of an assignee of a limited liability company interest under the TLLCL as are consistent with the other terms and provisions of this Agreement and with no other rights under this Agreement.  Without limiting the generality of the foregoing, an Assignee shall have only the rights to receive the share of distributions, income and losses to which the Assigning Member otherwise would be entitled.  If the Assigning Member's Interest in the Company is held by more than one person, the Assignees by majority vote shall appoint one person with full authority to accept notices and distributions with respect to such Interest in the Company on behalf of the Assignees and to bind them with respect to all matters in connection with the Company or this Agreement.  An Assignee may be admitted to the Company as a Substituted Member only upon the receipt of the prior unanimous written consent of the Members, which consent may be given or withheld in each Member's sole discretion.  Unless an Assignee becomes a Substituted Member, such Assignee shall have no right to obtain or require any information or account of Company transactions, or to inspect the Company's books, or to vote on Company matters.

(b)     Promptly following such time as the Company receives actual knowledge of the occurrence of a Section 9.2 Event, the Company will deliver a written notice thereof to each Member.  Thereafter, the Company shall, for a period of the later of thirty (30) days after such notice is given or thirty (30) days after the value of the Assignee Interest is determined pursuant to Section 9.2(c), have the right to elect to purchase all or any portion of such Assignee Interest for the fair market value of such Assignee Interest, as determined under Section 9.2(c) (without regard to this right to purchase such Interest). To the extent that the Company does not elect to purchase the Assignee Interest, each other Member shall have thirty (30) additional days from the date on which the Company's right to elect to acquire the Assignee Interest expires in which to elect to buy all or any part of the then-remaining Assignee Interest at the fair market value of such Assignee Interest, as determined under Section 9.2(c) (without regard to this right to purchase such Interest).  The Members electing to buy the Assignee Interest shall be entitled to purchase a portion of such Assignee Interest that is relative to the proportion that each such Member's Percentage Interest bears to the total Percentage Interests of all such Members or in such other proportion as they shall agree upon.  If the Members fail to elect to purchase all of the Assignee Interest to which they are entitled to purchase, the Members who elected to purchase some of the Assignee Interest shall have the additional option to elect to purchase a portion of the remaining portion of the Assignee Interest that is relative to the proportion that each such Member's Percentage Interest bears to the total Percentage Interests of all such Members or in such other proportion as they shall agree upon. This procedure shall be repeated until all of the Assignee Interest is covered by an election or until none of the Members desire to purchase any additional portion of the Assignee Interest.

**EXHIBIT 3**

(c)     The fair market value of the Assignee Interest shall be determined as of the date of the Section 9.2 Event.  The Company and all Assignees shall seek to reach agreement on the fair market value of such Assignee Interest in each instance.  Absent an agreement as to the fair market value, the Company shall obtain a qualified and independent appraiser (the "First Section 9.2 Event Appraiser") to appraise the value of the Assignee Interest.  The First Section 9.2 Event Appraiser shall determine the value of the Assignee Interest within thirty (30) days of the date of his or her appointment (the "First Section 9.2 Event Appraisal").  In the event that an Assignee disagrees with the First Appraisal (the "Section 9.2 Event Disagreeing Party"), the Section 9.2 Event Disagreeing Party shall notify the other(s) in writing within seven (7) days of the delivery of the First Section 9.2 Event Appraisal by the First Section 9.2 Event Appraiser to the Assignees, and within seven (7) days of delivery of said written notice, the Section 9.2 Event Disagreeing Party shall appoint a second qualified and independent appraiser (the "Second Section 9.2 Event Appraiser").  The Second Section 9.2 Event Appraiser shall determine the value of the Assignee Interest within thirty (30) days of the date of his or her appointment (the "Second Section 9.2 Event Appraisal").  If the Second Section 9.2 Event Appraisal is within ten percent (10%) of the First Section 9.2 Event Appraisal, the value of the Assignee Interest shall be the average of the First Section 9.2 Event Appraisal and the Second Section 9.2 Event Appraisal.  If the Second Section 9.2 Event Appraisal is not within ten percent (10%) of the First Section 9.2 Event Appraisal, then within seven (7) days following the delivery of the Second Section 9.2 Event Appraisal to the Company, the First Section 9.2 Event Appraiser and the Second Appraiser shall select a third qualified and independent appraiser (the "Third Section 9.2 Event Appraiser" and together with the First Section 9.2 Event Appraiser and the Second Section 9.2 Event Appraiser, each a "Section 9.2 Event Appraiser") who, within thirty (30) days of his or her appointment, shall determine the value of the Assignee Interest (the "Third Section 9.2 Event Appraisal").  The Third Section 9.2 Event Appraisal shall be binding.  The appraised value of the Assignee Interest determined in this Section 9.2(c) shall be final and binding upon all parties.  All expenses of the First Section 9.2 Event Appraisal and the Third Section 9.2 Event Appraisal shall be paid in equal shares by (x) the Company (and, with respect to the First Section 9.2 Event Appraisal, shall serve to reduce the purchase price of the Assignee Interest to be paid by the Company by the amount of such expenses), and (y) the Assignee.  All expenses of the Second Section 9.2 Event Appraisal shall be paid by the Disagreeing Party.

(d)     The closing of the sale and purchase of Assignee Interests pursuant to Section 9.2(b), shall take place at the offices of the Company on such date as the Assignee and the Company and/or the purchasing Member(s), as applicable, shall agree; provided, however, that in the absence of any such agreement, the closing shall occur on the thirtieth (30th) day after the later to occur of (i) the expiration of the last applicable time period described in Section 9.2(b), or (ii) the date that the fair market value of the Assignee Interest is determined as provided in Section 9.2(c).  Payment of the purchase price for the Assignee Interest shall be made as follows: unless otherwise agreed to by the parties to the purchase transaction, on the closing date of the purchase, the Company and/or the purchasing Member(s), as applicable, shall deliver to the Assignee a cash down payment equal to twenty percent (20%) of the total purchase price attributable to each such purchaser, and the balance shall bear interest at a fixed rate per annum equal to the Regular Interest Rate in effect on the date of purchase, adjusted on an annual basis, which shall be paid in quarterly installments of principal and interest over a period of five (5) years.

**EXHIBIT 3**

**9.3** **Transferees Bound by Agreement.** Any successor or Transferee or Assignee of a Member hereunder shall be subject to and bound by all the provisions of this Agreement as if originally a party to this Agreement.

**9.4** **Effect of Transfer.** Upon the Transfer of the entire Interest in the Company of a Member and effective upon the admission of such Member's Transferee(s) pursuant to Sections 9.1 or 9.2, the transferring Member shall be deemed to have withdrawn from the Company as a Member.

**9.5** **Preemptive Rights.**

(a) Except as otherwise provided in Section 9.5(d), the Company hereby grants to each of the Members on his or her own behalf and on behalf of his or her Affiliates, the right to purchase the portion of any future offering of any Interests or any other Participating Interests (an "Eligible Offering") in proportion to their respective Percentage Interests of the total Percentage Interests of all such electing Members or in such other proportion as they shall agree upon.

(b) Before issuing any securities pursuant to an Eligible Offering, the Company shall give written notice thereof to each Member. Such notice must specify the security or securities the Company proposes to issue and the consideration that the Company intends to receive for such security or securities being issued. For a period of twenty (20) business days following the delivery of such notice (the "Notice Period"), such notice by the Company shall serve as an offer entitling each Member, on his or her own behalf and on behalf of his or her Affiliates, to elect to purchase, by written notice to the Company, up to the portion of the securities being sold in the Eligible Offering calculated in accordance with Section 9.5(a); provided, however, that if two (2) or more securities are proposed to be sold as a "unit" in an Eligible Offering, any such election must relate to such unit of securities.

(c) If any such offer is accepted by a Member (each, an "Accepting Member"), the Company shall sell to each Accepting Member and each Accepting Member shall purchase from the Company, for the consideration and on the terms set forth in the Company's notice of such Eligible Offering, the number of securities that such Accepting Member has elected to purchase. If elections to exercise the rights pursuant to Section 9.5(a) are not made with respect to any securities included in an Eligible Offering within the Notice Period, or if there remain securities to be sold after the election of the Accepting Members, the Company then may sell such securities to third persons for the consideration and on the terms set forth in the Company's notice of such Eligible Offering. The closing of the purchase of securities in such Eligible Offering by the Accepting Members and third persons shall occur on the same date and such closing shall be held no later than sixty (60) days after the end of the Notice Period. Any Person to whom equity securities are issued pursuant to this Section 9.5(c) must, prior to consummation of the issuance to such Person, in addition to complying with the relevant provisions of Section 3.4 of this Agreement, agree in writing with the parties to this Agreement to be bound by and to comply with all applicable provisions of this Agreement and, from and after consummation of the issuance shall be deemed a Member for purposes of this Agreement.

-31-

**EXHIBIT 3**

(d)     Notwithstanding any other provision in this Agreement to the contrary, no Member has any preemptive right to purchase any of the following securities issued by the Company:

(i)     securities issued to the acquiree or its stockholders or Managers in connection with any merger, consolidation or acquisition to which the Company or any subsidiary is a party;

(ii)     securities issued to a financial institution or its Affiliates in connection with a debt financing to which the Company or any subsidiary is a party, so long as the primary purpose of the transaction is such debt financing;

(iii)     securities issued to employees, officers or Managers of the Company pursuant to any option, purchase or bonus plan, agreement or arrangement approved by the Members and permitted under the terms of the Certificate and this Agreement; or

(iv)     any right, option or warrant to acquire any security convertible into the securities listed in Section 9.5(d)(i).

**9.6     Securities Laws Restrictions**.  The ownership and Transfer of Interests is further subject to the following requirements and restrictions:

THE INTERESTS HAVE NOT, NOR WILL THEY BE, REGISTERED UNDER FEDERAL OR STATE SECURITIES LAWS.  THE INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, OR OTHERWISE TRANSFERRED UNLESS SO REGISTERED, OR UNLESS AN EXEMPTION FROM REGISTRATION EXISTS.  THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION MUST BE ESTABLISHED BY AN OPINION OF COUNSEL, WHOSE OPINION MUST BE SATISFACTORY TO THE MANAGERS.  ANY ATTEMPTED OR PURPORTED TRANSFER OR ASSIGNMENT IN VIOLATION OF THE FOREGOING SHALL BE VOID AND OF NO EFFECT.

**ARTICLE 10**
**Withdrawal and Expulsion of Members; Winding Up of Company; Amendments**

**10.1     Withdrawal and Expulsion of Members.**

(a)     No Member may withdraw from the Company without the unanimous consent of the  Members, which consent may be granted or withheld in their sole discretion.  If a Member withdraws from the Company without the unanimous consent of the  Members, such action shall be considered a breach of this Agreement, and the Company shall be entitled to treat the withdrawn Member as an assignee of such Member's Interest.  Any Member withdrawing in contravention of this Section 10.1(a) shall indemnify, defend and hold harmless the Company and all other Members from and against any losses, expenses, judgments, fines, settlements or damages suffered or incurred by the Company or any other Member arising out of or resulting

-32-
**<span style="color:red">EXHIBIT 3</span>**

from such withdrawal.   No Transfer of all or a portion of a Member's Interest in accordance with Article 9 shall constitute a withdrawal within the meaning of this Section.

(b)  A Member may be expelled from the Company by unanimous vote of all of the other Members (not including the Member to be expelled) if that Member (i) has willfully violated any provision of this Agreement; (ii) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company, or (iii) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company.  Thereafter, the Company shall, for a period of the later of thirty (30) days after the Company provides written notice of such expulsion to the expelled Member, have the right to purchase all or any portion of the Interest of the expelled Member for the fair market value of such Interest, as determined under Section 9.2(c) (without regard to this right to purchase such Interest). To the extent that the Company does not elect to purchase the Interest of the expelled Member, each other Member shall have thirty (30) additional days from the date on which the Company provided written notice of the expulsion to the expelled Member in which to buy all or any part of the then-remaining portion of the Interest for the fair market value of the Interest, as determined under Section 9.2(c) (without regard to this right to purchase such Interest).  The Members electing to buy the Interest shall purchase such Interest in proportion to their respective Percentage Interests of the total Percentage Interest of all such electing Members or in such other proportion as they shall agree upon.

10.2    **Winding Up of Company.**

(a)  The Company shall be dissolved, wound up and terminated as provided herein upon the occurrence of the earliest of the following events:

(i)  the written consent of all Members to dissolve the Company;

(ii)  the expiration of the period fixed in the Certificate for the Company's duration; or

(iii)  the entry of a judicial decree of winding up of the Company under Section 11.314(2) of the TLLCL.

Subject to Section 11.056 of the TLLCL, the Company will not however, wind up its affairs under any other provision of Section 11.051 of the TLLCL not stated in this Section 10.2(a).

(b)  In the event of the winding up of the Company for any reason, the Managers, or if the Managers has been removed by the Members pursuant to Section 8.4, then a liquidating agent or committee appointed by a Majority Interest (the Managers or such Person or committee so designated hereinafter referred to as the "Liquidator"), shall begin to wind up the affairs of the Company and to liquidate the Company's assets.  The Members shall continue to share all income, losses and distributions during the period of liquidation in accordance with Articles 4 and 5.  The Liquidator shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company property pursuant to such liquidation,

-33-
# EXHIBIT 3

giving due regard to the activity and condition of the relevant market and general financial and economic conditions.

(c) The Liquidator shall have all of the rights and powers with respect to the assets and liabilities of the Company in connection with the liquidation and termination of the Company that the Managers would have with respect to the assets and liabilities of the Company during the term of the Company, and the Liquidator is hereby expressly authorized and empowered to execute and file any and all documents (including a Certificate of Termination) necessary or desirable to effectuate the liquidation and termination of the Company and the transfer of any assets.

(d) The Liquidator must mail notice to each known creditor of and claimant against the Company in the manner described in Section 11.052 of the TLLCL.

(e) Notwithstanding the foregoing, a Liquidator which is not a Manager shall not be deemed a Member in or a successor Manager of this Company and shall not have any of the economic interests in the Company of a Member; and such Liquidator shall be compensated for the Liquidator's services to the Company at normal, customary and competitive rates for the Liquidator's services to the Company as reasonably determined by unanimous approval of the Members.

**10.3 Distribution in Liquidation.**

(a) The Liquidator shall, as soon as practicable, wind up the affairs of the Company and sell and/or distribute the assets of the Company. The assets of the Company shall be applied in the following order of priority:

(i) first, to creditors of the Company (including Members who are creditors to the extent permitted by law), in the order of priority provided by law;

(ii) second, to establish reserves reasonably adequate to meet any and all contingent or unforeseen liabilities or obligations of the Company, provided that at the expiration of such period of time as the Liquidator may deem advisable, the balance of such reserves remaining after the payment of such contingencies or liabilities shall be distributed as hereinafter provided; and

(iii) third, to the Members in proportion to their respective positive Capital Account Balances.

(b) If the Liquidator, in the exercise of sole discretion, determines that assets other than cash are to be distributed, then the Liquidator shall cause the fair market value of the assets not so liquidated to be determined. Such assets shall be retained or distributed by the Liquidator as follows:

(i) the Liquidator shall retain assets having an appraised value, net of any liability related thereto, equal to the amount by which the net proceeds of

-34-
# EXHIBIT 3

liquidated assets are insufficient to satisfy the requirements of Sections 10.3(a)(i) and 10.3(a)(ii); and

(ii)     the remaining assets shall be distributed to the Members in the same proportion as cash would be distributed to the Members pursuant to Section 10.3(a)(iii).

(c)     If the Liquidator, in the exercise of sole discretion, deems it not feasible or desirable to distribute to each Member that Member's allocable share of each asset, the Liquidator may allocate and distribute specific assets to one or more Members, individually or as tenants-in-common, as the Liquidator shall in good faith determine to be fair and equitable, taking into consideration, inter alia, the fair market value of the assets, the liens, if any, to which such property may be subject and the tax consequences of the proposed distribution to each of the Members (including both distributees and others if any).  Any distributions in kind shall be subject to such conditions relating to the disposition and management thereof as the Liquidator deems reasonable and equitable.

**10.4     Rights of the Members.**  Each of the Members shall look solely to the assets of the Company for all distributions with respect to the Company and such Member's Capital Account and Capital Contribution (including return thereof), and such Member's share of Profits or Losses thereof, and shall have no recourse therefore (upon winding up or otherwise) against any Member.  No Member shall have any right to demand or receive property other than cash upon winding up and termination of the Company.

**10.5     Deficit Restoration.**  Notwithstanding any other provision of this Agreement to the contrary, upon liquidation of a Member's Interest (whether or not in connection with a liquidation of the Company), no Member shall have any liability to restore any deficit in that Member's Capital Account.  In addition, no allocation to any Member of any Loss, whether attributable to depreciation or otherwise, shall create any asset of or obligation to the Company, even if such allocation reduces a Member's Capital Account or creates or increases a deficit in such Member's Capital Account; it is also the intent of the Members that no Member shall be obligated to pay any such amount to or for the account of the Company or any creditor of the Company (however, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, the Member is obligated to make any such payment, such obligation shall be the obligation of such Member and not of the Managers or of the Company).  The obligations of the Members to make contributions pursuant to Article 3 are for the exclusive benefit of the Company and not of any creditor of the Company; no such creditor is intended as a third-party beneficiary of this Agreement nor shall any such creditor have any rights hereunder, including without limitation the right to enforce any Capital Contribution obligation of the Members.

**10.6     Termination.** The Company shall terminate when all property owned by the Company shall have been disposed of and the assets shall have been distributed as provided in Section 10.3.  The Liquidator shall then execute and cause to be filed Certificate of Termination of the Company.

-35-

**EXHIBIT 3**

10.7     **Amendment to Agreement.**  Amendments to this Agreement shall require a super majority vote of the Members and shall be confirmed in writing by those supporting the amendment.

## ARTICLE 11
## Major Decision; Deadlock

**11.1     Request for Consent to Major Decision.**  If any Member (the "Offeror") requests in writing that the other Members (the Offeree(s)") consent to a Major Decision, consent shall be deemed given if the Offeror receives no response within thirty (30) days after the request. If the Offeree rejects the request within thirty (30) days after receipt of the request, and provided that Deadlock then exists, the Offeror may, by notice given to the Offeree within ten (10) days after his receipt of a timely objection from the Offeree, either (i) withdraw the request for consent to the Major Decision, or (ii) offer to purchase all Unit interests of the Offeree. The Offeror's failure to communicate an unequivocal election within such ten (10) day period shall give rise to a conclusive presumption that he has elected to withdraw the request for consent to the Major Decision, without prejudice to his right to request consent from the Offeree with respect to the same or any other Major Decision at a later time.

**11.2     Offeror's Offer to Purchase.**  If the Offeror elects to offer to purchase the Unit interests of the Offeree pursuant to clause (ii) of Section 11.1, then the Offeror's notice to the Offeree shall state that he wishes to purchase the entire (but not part of the) Unit interests of the Offeree in the Company for a purchase price equal to the product of the Specified Value (which shall be specified in the notice), times the Offeree's percentage interest in the Company (the "Proposed Purchase Price for the Offeree's Interest"). The Offeror's notice shall be deemed to be an alternative offer, regardless of whether it so states, to sell the entire (but not part of the) Units interests of the Offeror in the Company for a purchase price equal to the product of the Specified Value, times the Offeror's percentage interest in the Company (the "Proposed Purchase Price for the Offeror's Interest").

**11.3     Response by Offeree.**  Within thirty (30) days after receipt of the Offeror's notice, the Offeree shall give written notice to the Offeror of the Offeree's election to do one of the following: (i) accept the Offeror's offer to buy the Offeree's entire Unit interests in the Company for the Proposed Purchase Price for the Offeree's Interest; (ii) purchase the Offeror's entire Unit interests in the Company for the Proposed Purchase Price for the Offeror's Interest; or (iii) do none of those things, in which event the Major Decision with respect to which a Deadlock has been deemed to exist shall be resolved in favor of the Offeror. The Offeree's failure to communicate an unequivocal election within such thirty (30) day period shall give rise to a conclusive presumption that he has elected to resolve the Major Decision with respect to which a Deadlock has been deemed to exist in favor of the Offeror.

**11.4     Capitulation by Offeror.**  If the Offeree exercises its right to purchase or sell pursuant to Sections 11.3(i) or (ii) above, the closing of the sale shall take place pursuant to Section 9.6 unless the Offeror, within ten (10) days following the expiration of the thirty (30) day period described in Section 11.3, notifies the Offeree that the Major Decision with respect to which a Deadlock has been deemed to exist has been resolved in favor of the Offeree.

## EXHIBIT 3

**11.5**  **Closing of Sale.**  If a sale pursuant to the preceding provisions of this Article occurs, the closing shall take place at the office of the Company within the forty-five (45) business days following the expiration of the thirty (30) day period set forth in Section 11.3, unless the parties otherwise agree. The purchaser shall pay the full purchase price to the seller in wired federal funds or cashier's or certified bank checks drawn on or by any state or national bank. The purchaser shall execute and deliver to the seller a document (in form and substance reasonably satisfactory to the seller) indemnifying the seller from and against any and all personal liabilities and obligations of the seller with respect to the debts of the Company. The purchaser and seller shall cause any loans made by the seller to the Company or by the Company to the seller, together with interest accrued thereon, to be repaid at the time of closing. At closing, the seller shall execute and deliver all bills of sale, assignments, and other instruments as may be reasonably required to vest in the purchaser the seller's entire membership rights, free and clear of all liens and encumbrances. Notwithstanding any provision of this Article to the contrary, the seller may refuse to consummate the sale of his Unit interests in the Company unless and until all creditors who hold debt of the Company which has been personally guaranteed by the seller agree in writing to the release of the seller from its responsibility for such debt. The seller shall have the obligation of requesting such releases, and the purchaser shall have the obligation to lend reasonable cooperation to the seller (including, without limitation, consenting to the release, reaffirming the purchaser's own guaranty of the Company's debts and/or binding the purchaser personally for the Company's debts that are guaranteed by the seller) in obtaining such releases.

**11.6**  **Default.**  If either the seller or the purchaser fails to consummate the purchase, pay or receive the cash portion of the purchase price and perform any of the party's other obligations in accordance with Section 11.5, the other party, in addition to and not by way of limitation of any other rights or remedies at law or in equity, shall have the right to consider the issue with respect to which there was a Deadlock to have been resolved in favor of himself and to cause the Company to act or decline to act accordingly.

**11.7**  **No Effect on Other Obligations.**  Except as expressly set forth herein, no sale pursuant to this Article shall relieve the seller or purchaser from any duty or obligation owed to the Company or the other Members which accrued prior to the date of the sale or shall constitute a waiver or release of claims with respect thereto, except that should the sale result in Brian Owen no longer having a membership interest, then any obligation to make whatever amount remains to be paid of his initial capital contribution shall be deemed extinguished and no longer due and owing.

**11.8**  **Binding Arbitration.**  At any time prior to the consummation of a purchase of a party's Unit interests pursuant to this Article, either party may suggest that the Major Decision in question be submitted to binding arbitration in accordance with the rules of the American Arbitration Association. If the recipient communicates, within the time set by the person making the proposal, its acceptance of the suggestion, then the Major Decision at issue shall be referred to binding arbitration in lieu of continuing with the procedure set forth in this Article; provided, however, that a suggestion of binding arbitration shall not itself be a sufficient response when a party is called upon under this Article to make a response to another party, nor shall such a

**EXHIBIT 3**

suggestion have the effect of interrupting or suspending the period within which a party is required to give a response under this Article.

**11.9    Cross-Offers.**  Once an offer has been made by an Offeror pursuant to Section 11.2, the Offeree may not make a request or offer to the Offeror under that Section or Section 11.1 with respect to the same Major Decision until the offer made by the Offeror has been resolved. If two Members make an offer to each other under Section 11.2 under circumstances such that it is impossible to determine, by documentary evidence, which offer was made first, the offer which produces the first response from its Offeree shall be deemed to have been made first, and the other offer (to-wit, the offer made by such Offeree) shall be deemed never to have been made.

**ARTICLE 12**
**Representations and Warranties**

**12.1**    Each Member hereby represents and warrants to the Company and each other Member that:

(a)    if that Member is a corporation, limited liability company, partnership, trust, or other entity, it is duly organized, validly existing, and (if applicable) in good standing under the law of the state of its formation and is duly qualified and (if applicable) in good standing as a foreign company in the jurisdiction of its principal place of business (if not organized therein), and it has full corporate, limited liability company, partnership, trust, or other applicable power and authority to execute and agree to this Agreement and to perform its obligations hereunder and all necessary actions by the board of directors, shareholders, Managers, members, partners, trustees, beneficiaries, or other Persons necessary for the due authorization, execution, delivery, and performance of this Agreement by that Member have been duly taken;

(b)    that Member has duly executed and delivered this Agreement and it constitutes the legal, valid and binding obligation of that Member enforceable against it in accordance with its terms (except as may be limited by bankruptcy, insolvency or similar laws of general application and by the effect of general principles of equity, regardless of whether considered at law or in equity);

(c)    that Member's authorization, execution, delivery, and performance of this Agreement do not conflict with any other agreement or arrangement to which that Member is a party or by which it is bound; and

(d)    that Member is familiar with the existing or proposed business, financial condition, properties, operations, and prospects of the Company; it has asked such questions, and conducted such due diligence, concerning such matters and concerning its acquisition of Interests as it has desired to ask and conduct, and all such questions have been answered to its full satisfaction; it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company; it understands that owning Interests involves various risks, including the restrictions on Transfer and encumbrances

-38-
**EXHIBIT 3**

set forth in Article 9, the lack of any public market for Interests, the risk of owning its Interests for an indefinite period of time and the risk of losing its entire investment in the Company; it is able to bear the economic risk of such investment; it is acquiring its Interests for investment, solely for its own beneficial account and not with a view to or any present intention of directly or indirectly selling, transferring, offering to sell or transfer, participating in any distribution or otherwise Transferring of all or a portion of its Interests; and it acknowledges that the Interests have not been registered under the Securities Act or any other applicable federal or state securities laws, and that the Company has no intention, and shall not have any obligation, to register or to obtain an exemption from registration for the Interests or to take action so as to permit sales pursuant to the Securities Act of 1933, as amended (including Rules 144 and 144A thereunder).

**ARTICLE 13**
**Miscellaneous**

**13.1    Confidentiality.**

(a)    Each Member is entitled to all information under the circumstances and subject to the conditions stated in this Agreement and the TLLCL.  The Members agree, however, that the Managers or all of the Members, may determine, due to contractual obligations, business concerns or other considerations, that certain information regarding the business, affairs, property, and/or the Company's financial condition will be kept confidential and will not be provided to some or all Members, Assignees or Transferees and that it is not just or reasonable for those Members, Assignees, Transferees or representatives to examine or copy that information.

(b)    The Members acknowledge that they may receive information regarding the Company in the nature of trade secrets or that is otherwise identified as confidential ("Confidential Information") and that the disclosure of Confidential Information may be damaging to the Company or Persons with which it does business.  Therefore, each Member agrees to hold the Confidential Information in strict confidence.  The Members acknowledge that breaching the provisions of this Section 13.1(b) may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both.  Accordingly, the Members agree that the provisions of this Section 13.1(b) may be enforced by specific performance.  No Member may disclose Confidential Information to any other Person other than another Member, except (i) to the extent required by law or judicial process (provided, however, that such Member must notify the Company promptly of any such request for Confidential Information before disclosing it, if practicable), (ii) to advisers or representatives of the Member or the Member's Assignees or Transferees (but only if they have agreed to be bound by the provisions of this Section 13.1(b)), and (iii) disclosures of Confidential Information that the Member has received from a source independent of the Company that the Member reasonably believes obtained that information without breaching any confidentiality obligation with respect thereto.

**13.2    Notices.**  All notices, consents, waivers and other communications hereunder shall be in writing and shall be (a) delivered by hand, (b) sent by facsimile transmission, (c) sent

-39-
**EXHIBIT 3**

by email, or (d) sent by a nationally recognized overnight delivery service, charges prepaid, to the addresses of the Members as shown from time to time on the records of the Company. Any Member may specify a different address by notifying the Managers in writing of that different address. Each such notice or other communication shall be deemed to have been duly given and to be effective (w) if delivered by hand, immediately upon delivery if delivered on a business day during normal business hours and, if otherwise, on the next business day; (x) if sent by facsimile transmission, immediately upon confirmation that such transmission has been successfully transmitted on a business day before or during normal business hours and, if otherwise, on the business day following such confirmation, (y) if sent by email, immediately upon transmission (unless the sender becomes aware that such transmission was unsuccessful) on a business day before or during normal business hours and, if otherwise, on the business day following such transmission, or (z) if sent by a nationally recognized overnight delivery service, on the day of delivery by such service or, if not a business day, on the first business day after delivery. Notices and other communications sent via facsimile or email must be followed by notice delivered by hand or by overnight delivery service as set forth herein within five business days.

**13.2    Binding Nature of Agreement.**    The provisions of this Agreement shall be binding upon the executors, administrators, legal representatives, heirs, successors and assigns of the parties hereto.

**13.3    Entire Agreement.**  This Agreement constitutes the entire agreement among the parties.  It supersedes any prior agreement or understandings among them, and may be modified or amended only in writing as set forth herein.

**13.4    Governing Law.**    THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICTING PROVISION OR RULE (WHETHER OF THE STATE OF TEXAS OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF TEXAS TO BE APPLIED.  IN FURTHERANCE OF THE FOREGOING, THE INTERNAL LAW OF THE STATE OF TEXAS WILL CONTROL THE INTERPRETATION AND CONSTRUCTION OF THIS AGREEMENT, EVEN IF UNDER SUCH JURISDICTION'S CHOICE OF LAW OR CONFLICT OF LAW ANALYSIS, THE SUBSTANTIVE LAW OF SOME OTHER JURISDICTION WOULD ORDINARILY APPLY.  ANY ACTION TO ENFORCE THIS AGREEMENT MUST BE BROUGHT IN, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF, A COURT SITUATED IN TARRANT COUNTY, TEXAS.  EACH PARTY HEREBY WAIVES THE RIGHTS TO CLAIM THAT ANY SUCH COURT IS AN INCONVENIENT FORUM FOR THE RESOLUTION OF ANY SUCH ACTION.  EACH PARTY TO THIS AGREEMENT WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM.

**13.5    Mediation and Arbitration.**    If a Dispute arises in connection with this Agreement or the breach thereof and if the Dispute cannot be settled through direct discussions, the parties agree to endeavor first to settle the Dispute in an amicable manner by mediation to be held in Dallas, Dallas County, Texas, United States of America, administered by the American

**EXHIBIT 3**

Arbitration Association under its Commercial Mediation Rules before resorting to arbitration. The mediation will be completed within thirty (30) days of receipt of written demand for mediation. Thereafter, any unresolved controversy or claim relating to this Agreement or breach thereof will be settled by binding arbitration initiated by written notice by either party to the other of the intent to arbitrate. The arbitration will be held in Dallas, Dallas County, Texas, United States of America, and administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered may be entered in any court having jurisdiction. Notwithstanding any other provision of this Agreement or this Section 13.5 to the contrary, no party will be precluded from seeking injunctive relief or a temporary restraining order before implementing procedures for mediation or arbitration, provided that such party determines in the good-faith exercise of its reasonable best judgment that it will suffer irreparable harm or injury by any delay caused by mediation or arbitration proceedings.

13.6 **Pronouns and Number.** Wherever it appears appropriate from the context, each term stated in either the singular or the plural shall include the singular and the neuter shall include the masculine, feminine and neuter.

13.7 **Headings.** The headings and captions herein are inserted solely for the purpose of convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction of any term or provision hereof.

13.8 **Partial Enforceability.** If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder hereof and the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby.

13.9 **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. In addition, this Agreement may contain more than one counterpart of the signature page and this Agreement may be executed by the affixing of the signatures of each of the Members to one of such counterpart signature pages. All of those counterpart signatures pages shall be read as though one, and they shall have the same force and effect as though all of the signers had signed a single signature page.

[Signature page follows]

-41-

**EXHIBIT 3**

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first written above.

**THE COMPANY:**

JET OILFIELD SERVICES, LLC,
a Texas limited liability company

By: *Brandon Wilkins*
Name:  Brandon Wilkins
Title:  Managers

By: *Lorne Moseley*
Name:  Lorne Moseley
Title:  Managers

By: *Thomas Smith*
Name:  Thomas Smith
Title:  Managers

**MEMBERS:**

*Brandon Wilkins*
BRANDON WILKINS

*Lorne Moseley*
LORNE MOSELEY

*Thomas Smith*
THOMAS SMITH

*Brian Owen*
BRIAN OWEN

-42-

# EXHIBIT 3

## EXHIBIT A

### Capital Contributions – Members

| Name | Percentage Ownership | Capital Contribution |
|------|---------------------|---------------------|
| Brandon Wilkins | 20.00% | $ 101,161.50 |
| Lorne Mosely | 20.00% | $ 100.00 |
| Thomas Smith | 20.00% | $ 101,161.50 |
| Brian Owen | 40.00% | $ 3,000,000.00 |
| Total | 100.00% | $ 3,202,423.00 |

-43-

# EXHIBIT 3